Thank you, Your Honor, and may it please the Court. My name is Michael Risher. I'm here on behalf of the plaintiffs and appellants in this case. Okay. Now, before you begin, I should say something. I think it's probably apparent to all of you who are litigating this case, and I do not say this expecting anyone to do anything about it. I just want to say that one of the two lawyers arguing this case today is my former law clerk, Mr. Powell. It will have no effect on my decision, and I don't intend to recuse, but I should just say that so everyone is aware of that. Thank you, and we were aware of that, Your Honor. Every year in the state of California, some 100,000 people are arrested on suspicion of a felony, but they're never convicted of anything. Not a felony, not a misdemeanor, not an infraction. Nonetheless, the government is using the mere fact of that arrest as an entitlement to seize, search, and analyze the DNA of every single one of these presumptively innocent arrestees who were never convicted. Mr. Risher, I wonder if you'll forgive me for interrupting your start here, because I know you're well prepared. I know our panel has many questions about this case. It is an important case, and I wonder if you'll forgive me if I just kind of go through a series of things that I've been wrestling with. I'm hoping you can help me. I will do my best. Okay, in this particular case, were all of your clients fingerprinted when they were booked? Yes. That is a standard part of the booking process under Penal Code 7. And were those fingerprints retained permanently by local, state, and federal government officials? It's my understanding that they were. Okay, and are those frequently used to help solve past and future crimes? I don't know if frequently is a word I can address. They will strike frequently. Are they used to solve past and future crimes? That's a secondary purpose for which they're used. Okay. Is it a violation of the Fourth Amendment's unreasonable search clause to take the fingerprints of a person who has been charged with a felony or any person charged with a crime? To break that down, it is not even a search under the Fourth Amendment to take the fingerprints of somebody who has been arrested or is otherwise detained by the police. Do you have authority for that? Yes. Davis v. Mississippi, the Supreme Court said so. Then it's not a search? It's not a search. Fingerprinting, and to paraphrase Davis, fingerprinting involves none of the probing into the body that characterizes search. Have you ever had your fingerprints taken? Yes. A full set? A full set, I think, when I joined the bar. Okay, so when they roll your fingers and so on, you think that's more or less invasive than a buccal swab for DNA? My take is that it's infinitely less invasive. I would be — I shake hands with people when I meet them. I don't let them put things in my mouth, obviously. And fingerprinting — We're very pleased to hear that. I was trying to personalize it. Fingerprinting is supported by 100 years of history, and we know that sometimes the law goes by history rather than logic. But it's not a search. If it were a new technology, would you be complaining about fingerprinting? I don't think so. And the reason I say that, we have new technologies that are truly being used to identify people. For example, in the Contra Costa County Jail and the Monterey County Jail, retinal — or excuse me, iris scanning. Now, that may raise some issues, but iris scanning, like fingerprinting, doesn't intrude at all into the body, and it doesn't reveal anything about you other than your identity in the narrow sense of the term. Okay, let's focus on — DNA is very different. Let's focus on identity for a minute. Let's just assume for a moment — and this is strictly hypothetical, but it will help me understand. Assume for a moment that one of your clients, in addition to being a protester or someone arrested for a minor felony, if they can be minor, was also the alleged grim sleeper recently arrested in Los Angeles. If the grim sleeper had left fingerprints on a murder weapon left at a scene in each of his 11 murders, would it be constitutional to use the fingerprints to help solve those murders? Well, certainly there's no Fourth Amendment issue in taking the fingerprints from the crime scene or taking DNA from the crime scene, for that matter. What would matter is whether the obtaining fingerprints from the person in that case — and incidentally, that case did not involve an arrestee database. I understand that. I'm giving you a hypothetical, okay? If under — if the police had unlawfully detained him and taken his fingerprints and matched them to the crime scenes, that would be a Fourth Amendment violation, and that was exactly what happened in Davis v. Mississippi 50 years ago, more than that, where the Supreme Court looked at this exact situation and said, if you unlawfully take somebody's fingerprints in violation of the Fourth Amendment, that can be suppressed. That must be suppressed. Same situation with DNA. If the taking of the fingerprints, if the taking of the DNA from the individual, not from the crime scene, from the individual, violates the Fourth Amendment, then it violates the Fourth Amendment. And in a criminal case, we'd suppress it. Fortunately, we're not there. All right. Let's assume for a moment that — let me go back for just a second here. Prop 69 basically went out of its way to state — and I'll just read this quickly, because it will set the framework for my question. It says, And the following person shall provide buccal swab samples, right thumbprints, and a full palm impression of each hand and any blood specimens or other biological samples required pursuant to this chapter for law enforcement identification analysis. So at least for purposes of the law, the alleged purpose for taking the buccal swab and the other identifiers was for identification purposes. You take the position that an unwarranted, unsuspicioned taking is unconstitutional. Let's assume for a moment that — say Prop 69 were changed differently, and it just said that you will take DNA. So let's assume, for example, that — and I don't mean to be gross, but say that you took it from the fecal matter or the urine of a prisoner who had discarded it or after they ate pizza or some other delicacy from the jailhouse commissary. They took it from the silverware or, I should say, plasticware. Would that be unconstitutional? That would raise very different issues for several reasons. First of all, there would be no initial intrusion into the body. And the buccal swab is, although a minor type of body cavity search, it's an intrusion into the body in the same way that a breathalyzer is. So you would not have that aspect. So your concern is the way in which the DNA is taken, not the fact that it is taken. Half of my concern is the way. Maybe a third of my concern is the way in which it's taken. Okay. The remainder of my concern, and what I think is the more significant part of it, is DNA is our genetic blueprint. Science is — But you're talking about — and I do understand this. It's a serious civil rights issue. But you're basically saying the police and the authorities have got my DNA. Yeah, you can use it for identification, but you can also use it for a whole bunch of other things. Now, Prop 69 criminalizes those uses. So far as I know, there's never been any use. Of course, it's a relatively new statute. There's never been any use for other than ID purposes. Well, of course — I mean just for ID. Let's say it's all it's used for. Let's say there were some way to render it useful only for ID purposes. What's the problem there? Well, the initial problem is that the government's definition of identification purposes is extremely broad. That's all the statute allows it to be used for. By definition, everything they're doing with it, including familial searching, and using the primary purpose, which is to run for cold hits in the database, that's all identification purposes. Identification purposes doesn't really put a meaningful limit on what it can be used for. Obviously, it would stop something. Well, let's just say the statute were amended to say that it can only be used for purposes of determining whether the person charged, in this case with a felony, has committed or does commit in the future a crime. Is that sufficient for your purposes? That can be interpreted, I mean, to allow all sorts of things. Well, do we allow it to be used as proof of some sort of propensity? Again, yes, if we had a more focused statute, for example, one that required automatic expungement, one that didn't allow the government, didn't require the government to keep the biological sample, that would ameliorate some of the concerns here. It would not get at the basic concerns that we have, which are twofold. This is a search purely for law enforcement purposes, justified solely by the fact of an arrest. And the Supreme Court in Gants said that the idea that an arrest can justify searches for law enforcement purposes is anathema to the Fourth Amendment. That was searches of cars, where we have very little expectation of privacy. This is a seizure, permanent data banking, and analysis of our biological sample of our genetic blueprint. But for identification purposes, it's just a better form of fingerprinting, isn't it? It's – you know, I think that's really a misleading analogy, and it's called – what's misleading is that it's called genetic fingerprinting. Courts have recognized – Chrysler recognized this. Kincaid, the majority in Kincaid – excuse me, a majority in Kincaid, comprising the four judges in dissent and Judge Gould, made it very clear that you can't simply make that comparison and say, well, we're done with it. The Fourth Amendment requires you to look at reality. And the reality is our fingerprints tell us nothing about us. Our DNA can tell us a huge amount about us. And sure, the government says, well, we're not going to look at it. We'll just keep it. But again, we wouldn't be comfortable giving our private papers and diary to the government just because they said, well, we don't want to look at it. We just want to keep it. Well, it seems to me that that argument on the facts of this case and this California law doesn't get you very far because the DNA that they're taking is so-called junk DNA, which doesn't tell us either anything or very much about our characteristics, or I'm misunderstanding what they're taking. Well, what they're taking is a biological sample that contains all of our DNA. Right. And what they are doing with it is analyzing it to find the 13 pairs of alleles. And once they've analyzed to find the 13 pairs of alleles, do they keep the DNA or do they just keep the computer printout that shows? They absolutely keep the DNA. That's a big problem. They have the possibility in the future of doing a further analysis of the entire DNA. And in 2001, the state of California reanalyzed its entire DNA databank using the biological samples to allow it to use more sensitive searching. And when we talk about identification, when we think about DNA databanks, we think, okay, you've got your crime scene, you've got your person you've taken DNA from, you put them in the computer, they match, bang, you've got your cold hit. Talking about the Grim Sleeper case, that's not what happened there. They ran their databank. They didn't get a cold hit. They should have. It seems that this person they've arrested should have given a DNA sample in 2004 when the law went into effect because he was on felony probation. He was a convicted felon. Be that as it may, they didn't do that. They find someone who's innocent. That may have been an extremely appropriate use of that technology, but it shows that the government is broadening the notion of what it can do with these things. And that's really been the story of DNA databanks from the beginning. Doesn't our case law, though, counsel, indicate that when we as a court of appeal review these matters, that we have to review the case before us? I grant you there are some things that can be done with DNA that present a whole new level of search. But in this case, as I understand it, what we have is Prop 69, which purports by its terms to limit its use to identification. Am I incorrect in that? It does purport by its term to limit to identification without defining the term in any way. Right. And, of course, the Court looks at the facts in front of it. Under KILO, it also looks at available technologies and emerging technologies. And you can't look at this case, I don't think, and say, well, it's okay for the government to be taking this stuff because they're saying that they're not going to do anything more with it. Just the fact, and if you look at Mr. Akash Desai's declaration in this case, he's unique among our four named plaintiffs in that he gave a declaration soon after he'd been subject to this extraction of his DNA. It's much more than just even the mere fact that the government has this, for him at least, and I think for a lot of us, is itself a harm. Hasn't our court, though, already in Kincade and the others that have dealt with this issue, haven't they universally, haven't you and your folks who are representing the same issue, basically made the same argument that, you know, and it will use it to do all kinds of horrible things. And I don't question that. And Judge Reinhart's eloquent dissent, Judge Kaczynski's joining in a separate dissent about kind of a 1984 Big Brother thing. It's very real. I don't question that. I just question whether under our jurisprudence, we aren't limited to dealing with what's before us now. We're not writing a novel here. We're construing a statute that has specific words. Are we not bound by that? This Court is not bound by the State of California's decision as to what types of searches are constitutional under the Fourth Amendment. I mean the wording of the statute, though. Certainly, well, we have a facial challenge. We have an as-applied challenge. Under either of those challenges, particularly under the as-applied challenge, we need to look at all of the interests involved here. And the truth is that in Kincaid, the plurality, looking at convicted felons who are still serving their sentences, said we're not going to look at that, the genetic privacy interests involved for these people, who, of course, have no privacy. But five judges thought otherwise. In Kreisel, we had, again, a split decision. But the majority in Kreisel, two judges said, specifically referencing Judge Reinhart's dissent and Judge Gould's concurrence, said this presents a real danger to privacy. Again, that's a paraphrase. And, of course, the dissent in Kreisel would have gone much farther and said even convicted felons who are being punished at this moment cannot be forced to give their DNA. So I don't think yes, it's nice that we have those statutory protections. Those statutory protections, the fact that they are written into this law, illustrate just how sensitive the information in our DNA can be. But it doesn't it doesn't solve the problem that they are taking our DNA and analyzing it and they're doing it. The time is running. In fact, the time we originally allotted has expired. But just so everyone knows sort of the ground rules that our panelists agreed on, we will not strictly enforce the 15 minutes. This is an important enough case. We'll just talk until we've heard what we need to hear. You said what you need to say and that applies to both sides. But nonetheless, time is not unlimited. So I want to interrupt you. What if the statute provided for taking of RSD DNA for all felony RSDs, but automatic discarding of the DNA and any information derived from that DNA for anyone who does not get convicted, instead of this very cumbersome process, which you make a separate point about that. No, it's automatic. And for those who are convicted, you keep it. For those who are not convicted, which is going to be roughly a third, I guess, of the RSDs, as soon as it's clear that they're not going to go through the criminal process, you throw it away. Is that constitutional? No, it ameliorates some of the problems. But again, we don't let the police come into our house and take stuff. Why would that not be constitutional? On a theory of protecting the public from someone who's been arrested, the possibility, you know, there's a fairly high percentage that this person is going to be convicted in the end. I mean, this is not a random sampling of the population. I mean, we do various things with RSDs in terms of protecting the public with respect to bail and so on. I mean, this is no longer an undifferentiated part of the population. Right. And I think those are at least legitimate purposes. But in your view, that does not outweigh. Well, OK, if we if we play that out a little bit, we have the taking of the sample. That violation is done at the time it's done. Well, no, that is done. You've just promised that it's a violation. No, that that is done. Right. In my mind, a violation. Then we have. And of course, there's a big time lag.  Well, that is a separate intrusion into privacy under Skinner. So certainly if they took the sample and then only analyzed it upon conviction, that would ameliorate. No, I'm not. No, my hypothetical would know they would be analyzing it as soon as possible to kind of see what kind of a person they've got here. So as to figure out whether or not they've got additional reasons to help elevate alienated bail or whatever else is going to be.   It's not to say that there's any other reason to help elevate an alienated person. It's to say supervision purposes of this individual. Well, again, looking at the facts of this case and not some possibility in 10 years or 20 years, that's not happening now and it can happen because the analysis itself is going to take a week unless you're doing if you're doing it by batch. That's on the record. Mr. Cassanis, his declaration and the backlogs mean it takes a month. They're not using it to identify people. The sole purpose for taking this is if they can run it in their database and see if they get cold hits. They haven't yet with the arrestee database. They haven't shown that it does anything to solve crimes that testing wouldn't. So again, that's not sure that's quite true. There are numbers are pretty weak, but I don't think they've shown nothing. If you will. And it's a relatively new statute, is it not? Well, sure. It's been as of the hearing. It had been in effect for about 11 months. There are 134,000 samples that they've taken and uploaded, not counting the ones in the backlog. They haven't shown a single case where that did anything to solve a crime that would not also have been solved by conviction testing. I think Judge Breyer mentioned what if you've got people that wear gloves at the time of a commission of a felony or do something else that masks fingerprints but maybe leave DNA around, such as allegedly the grim sleeper did. Following up on Judge Fletcher's question, why can't the police, while somebody, before they have the trial, I know the Speedy Trial Act requires either 60 or 70 days, but almost nobody follows that because the defense asks for more time. So they're held usually unless they're out on bail. If they have a hit and only the DNA makes that possible, why isn't that identification substantially the same as, say, for example, fingerprinting, except in this case, like the grim sleeper, he left a DNA print on a pizza box, but he didn't leave fingerprints before? Well, the part about getting a hit is very similar to what happens with the automated fingerprint information system. It's the other interests that precede that, the intrusion into the body, the genetic privacy interest that exists with DNA. I understand. And certainly it would be more efficient for the government to take DNA from everyone it wanted to take DNA from. In some ways, not more efficient. It would generate more hits. If we walk outside the courthouse and round up 200,000 people and take their DNA, we'll get some hits. We would solve some crimes more than we are now solving if the government had a database of the DNA of everyone in the country. Absolutely. Yeah, sure. Absolutely. I'm not sure we know the number, but there would be more. And your stronger case is an as-applied challenge, isn't it? I mean, you can take each step along the way as you've articulated. Whereas on a facial basis, looking just at the statute, it says for identification purposes, and if I may get your input on this, one of the cases, of course, that we're all going to be talking about and thinking about is Friedman that Judge Thomas wrote. But in that case, he indicated on page six of the just the printout, I guess it's page. I'm not sure what page it would be. Probably 849. He says this search, referring to Friedman, was not related to the Nevada charges then pending against Friedman. Well, unlike that, in this case, the DNA that's taken is related to the charges of your clients, are they not? No. There's a probable cause. They're arrested. They wouldn't have this DNA taken but for the arrest. That's the exact same situation in Friedman, putting aside the fact that there's a statute and I can deal with that. But in Friedman, he was under arrest for something. They took DNA, and this is exactly what they say in the opinion, to see whether you'd get anything in the database. They were forced to take it by force because he refused. The statute here authorizes this. The situation we have here, and it is both an as-applied and a factual challenge before this Court. The situation before this Court is factually identical to what happened in Friedman. The government, simply because they have someone under arrest, wants to take that person's DNA by means of a buccal swab in order to analyze it for just these 13 alleles, upload that into CODIS to look to see whether they can solve some unsolved crimes. I don't see a distinction. Now, there is a statute. The Supreme Court in Virginia v. Moore suggested that's irrelevant. They say the word irrelevant. No, and I understand the statute. I mean, if a statute violates the Constitution, hey, you know, it's gone. I won't belabor that. But the reality is you're really talking about Judge Thomas used some very broad language. If his language, whether or not it's dicta, is another matter, but if you take his language, then you probably win, because he uses very, very broad language about arrestees on a situation where it's a warrantless, suspicionless taking of the DNA. But in that situation, Mr. Friedman was apparently not having the DNA taken in connection with his arrest. He's really no different than if we went out on the street and asked everybody here that's in the courtroom, the police said, we want a buccal swab from every one of you. Well, I have to disagree with that, because Mr. Friedman was under arrest. He was in custody. But according to Judge Thomas, the search was not taken, and I'll just read this again, was not taken, was not related to the Nevada charges in Penning. As I understand it from what went on before and from what we can gather in the record, you've got these people in Montana. They apparently blew it. They didn't take it before when he was in prison for over 10, 20 years for a sex offense. They could have taken it at any time, and they didn't do it. They contacted people in Nevada and said, we really want this. Get that, okay? That's why they did it. It had nothing to do with the statute in Nevada, whereas here we're talking about a statute that says everyone arrested as a felon, i.e. with probable cause, they go through the booking process, and when you do that, we want you to get buccal swab. We want you to get a palm print. We want you to get a thumb print and any blood sampling that we're allowed to take. So that's different, is it not, than Friedman, to that extent? No, because, again, the statute authorizes. In Friedman, it was one case. Here it's tens of thousands. I don't think the constitutional violation becomes any less significant because we're doing it to tens of thousands of people rather than to one. I concede that. But I'm just saying that it's not what Judge Thomas said, that it was being done for a purpose other than for what he was arrested. Isn't that a distinction? But the DNA testing being done here, certainly with respect to my four individual clients and with respect to all of these people, it has nothing to do with the crime for which they're charged. But they wouldn't be taken unless they were arrested, would it? Mr. Friedman's DNA wouldn't have been taken unless he had been arrested either. There are cases where DNA is related to the crime that they're arrested for. In any sort of sexual assault case where there is semen found at the scene. Right. The same probable cause that justifies arrest would justify a warrant. That's the same with any case where we have DNA at the crime scene. In those cases, that's what Judge Thomas says means, I believe, when he's talking about the DNA test being related to the crime of arrest. It is directly related in an evidentiary way. There's no allegation that DNA evidence would have helped the district attorney prove any of the charges in our case or in any shoplifting or bad check case or anything like that. There doesn't really need to be, does there? To get a warrant, there would have to be. No, to get a warrant. I understand that. But I hear you're talking about, correct me, help me with this. What I struggle with in this, frankly, is the fingerprint versus use of DNA for identification purposes. I grant you the problem with the 1984 kind of use. But just for purposes of identification, somebody goes in, your clients go into the booking office, their freedoms are clearly curtailed, their expectations of privacy are clearly curtailed, and the Supreme Court has spoken of a continuum in terms of how that works, and so has our court. So they go in. They can't just call whomever they wish. They can't wear whatever clothes they want no matter what. They can't sleep in whatever cell they want. They can't ask for hypoallergenic pillows. They've got a whole bunch of things that they can't do. Their freedoms are somewhat restricted. And the statute says when you book these people, do these things. They probably also have their picture taken. They do. It's part of a normal booking process. And what I'm struggling with, frankly, and it is a struggle, is what's the difference if you use it strictly for identification purposes to take what is apparently a very minor little thing, you put a little swab in the mouth, that's it? I frankly think taking your fingerprints is much more of an invasion. You get some rough official who smashes your fingers down over the deal. I don't see that there's a whole lot of difference. Why is that wrong? I have an answer for that, I think. First of all, many of the restrictions on liberties of arrestees are justified by something that's akin to the Turner v. Safely standard. We need to search them so they don't bring drugs into the jail or guns. We need to fingerprint them to identify them, identify, figure out who we have, whether he has a warrant, whether he's got prior history, that type of thing. Fingerprinting is an administrative search, the primary purpose of which is to figure out who they have. And that means that it's a special needs search under Ferguson. And forgive me for interrupting, because I've asked my colleague forgiveness for asking so many questions here. We'll all get a chance to do it. What's the difference, though, here? Take my postulate. Thirty days later, it comes back, you have a cold hit, and you find out that the person that you've arrested there is, in fact, likely the grim sleeper. What's wrong with that? Well, there's nothing wrong with solving crimes. But if we give the police the unlimited authority to conduct searches to do that, then we have no point in that. Again, part of the booking procedure, just like fingerprinting. The thing is, it's not just like fingerprinting for several different reasons. First of all, the use to it, fingerprinting, as I said, is justified as an administrative special needs search to find out who we have. The evidence in the record is uncontradicted. You send it off to the Department of Justice. You get a result in a couple hours. DNA is not being used for that purpose at all. The sole reason they are taking DNA is to try to solve unsolved crimes. A compelling interest. Let's go back to the example I just gave them. The unsolved crime is one of your clients, whoever, it doesn't matter, client A. My clients are all innocent, of course. What? My clients are all innocent. I know that. Of course they are. We hear that a lot. It might even be true here. Yeah, it might be true. Okay. But they've been arrested. They're the probable cause. And say that within 30 days they're still, nobody's posted bail. And they find out that, in fact, a DNA of one of your clients was found at the scene. That's for identification purposes, past crime. But it's your client in the hypothetical. Yes. Why is that different than the fingerprint? That portion of it is not different from the fingerprint. What's different is the original exclusion. I mean, we can identify people through all sorts of means. We can identify them by going into their houses and looking at their personal papers. But this is just a really good way of identifying people. I mean, basically what you're saying is we have to be Luddites. We have to, you know, we basically can't use modern technology because it's too good. It's a very good way to solve crimes. It is an extremely good way to solve crimes. Again, identification is such a slippery term the way we're using it. There are all sorts of very good techniques the police have that they could use to solve crimes, stopping people that they have a hunch about on the street, searching them, searching the cars of everyone they arrest. I mean, we got a huge number of guns and a huge quantity of drugs by simply searching the car of everyone they arrested. The Supreme Court says, no, you can't do that. The Fourth Amendment says so. Right. This is the same situation. Sure, we would solve crimes by getting more and more samples. I don't think that arrestees are particularly fruitful. The truth is that the violent felons, they're not just getting arrested. They're getting arrested and then convicted, if not the first time, then the second after they commit another crime. There has to be a line. The line here is, I think, the very fundamental distinction. In fact, maybe the most fundamental distinction that our criminal justice system draws, and that's the distinction between people who have lawfully been convicted of a felony. We can assure ourselves that they're guilty and the rest of us. A single arrest by a police officer has never been sufficient proof that a crime has been committed. If it were, we wouldn't need our criminal courts. The argument that you're making was also made before our court with respect to people who were on parole, people that were probationary, people that had been convicted. It's basically a sliding scale. It's a continuum. And like you, we're trying to understand where the constitutional line should appropriately be drawn. It's not easy, believe me. All of us on this panel have wrestled with this. I've wrestled with this case for weeks. It's a very hard case. But it's not black and white. It's a continuum. You're dealing with where do you draw the line. And take a look at Sampson, which, of course, was decided after Kincaid. Sampson says, I think it's clear, especially read in conjunction with Scott, you draw the line at conviction. Someone's convicted. He's being punished. Part of that punishment is taking away his Fourth Amendment rights. Okay. You know what? This could continue forever. Yes. If it were not such sweet pleasure, I would. Let's hear from the State. Thank you. And then we'll give you a chance to respond. Okay. Good morning, Your Honors. Deputy Attorney General Daniel Powell for the State. I'd like to start by noting that, Judge Smith, I think your intuition that DNA is like fingerprints is both accurate and is Ninth Circuit law. This Court in Reyes held that the information derived from the blood sample and the subsequent testing of DNA is substantially the same as that derived from fingerprinting, an identifying marker unique to the individual from whom the information is derived. California obtains the same information from fingerprints as it does from DNA. And therefore, what do you need the DNA for except for the additional purpose of solving crimes? I think we use it for a wide variety of reasons, just like we use fingerprints. In both cases, they can be used to identify. DNA is a more accurate version of identification. But in fact, as I understand the record, DNA is not the primary mechanism of identifying. When somebody shows up at the jail, you take their fingerprints. Once you've taken the fingerprints, you check and see what's in the database. If they've already done this or that or if you already have their DNA, you don't take it further. You don't take their DNA to figure out who they are. You take their fingerprints to see who they are. Once you know who they are from the fingerprints, then you take the DNA. And given you already know who they are from the fingerprints, it seems to me the only supplemental purpose you're serving is crime detection. I mean, two points. I think, first of all, as the district court identified and as the Supreme Court has said in Hibble, the concept of identification is broader than just who the person is. I think for law enforcement purposes, it does include what the individual has done. And moreover, that pretty soon we're talking Pickwickian vocabulary, meaning identification has a somewhat flexible meaning. But the ordinary use of the term identification is not information that I use to solve crimes. I mean, I understand that it's not a totally implausible use of the term, but it's not the ordinary. It's not the first thing that occurs to you. I want to know who you are. OK, what's your name and so on. But that doesn't that identification doesn't include. Did you cheat on your test in the seventh grade? No, certainly. But I think for law, even though that may not be a lay person's understanding of identification, I think for law enforcement is I think the first thing that an officer does when he stops someone for a Terry stop is run their license to see what other crimes is this person committed. Do I do I need to be concerned for my safety as an officer? Sure. And, you know, in Hybl, they the court made that point. Knowledge of identity may inform an officer that a suspect is wanted for another offense. And in Kincaid, Judge Reinhart made this exact point in his dissent. And the plurality in Kincaid certainly knew what they were saying when they said DNA identifies. The other point I'd make is the same thing is true for fingerprints. While it may be the case in a large city like San Francisco that police officers don't know who they're dealing with, there are going to be a lot of situations in which they do know, you know, based on the person's identification, based on their past experience. If you come from a small community, the police officers may know the individuals who are coming before them. Nothing in the Fourth Amendment prohibits them from still taking those fingerprints and running them through APHIS. So just as DNA both identifies and is used to determine whether or not an individual is implicated in a past crime, fingerprints are used the exact same way. And I think that the other point I want to make is I think there was a lot of question about why the State retains DNA. And I think it's important to explain why that is. It's for two purposes. The first is that when the State has a match between an offender profile and a crime scene profile, it retests that offender profile to make absolutely sure that there is a match, that there wasn't a lab mistake. So in that sense, they retain it for the protection of the defendant so we're not investigating someone whose DNA doesn't actually match. And the second reason is as the science of DNA gets more and more accurate, we do retest the DNA. But again, only for identification. It would violate the statute and would subject DOJ employees to criminal and civil penalties if they did anything else. Do I understand correctly from the record that at least it's the position of the State that one of the beneficial purposes of DNA is that it has helped identify people who were wrongly identified in the first place and exonerated, for example, in rape cases and things where people have been convicted later on and determined from doing DNA sampling that it wasn't that person and they've been released from jail? Absolutely, Your Honor. I mean, that's an interest that was identified in Kincaid and Creasle and is part of the purposes of Prop 69 itself. I mean, that was in the Declaration of Intent. I agree with you and that's an important purpose. And this is not the case now in front of us. But because I agree with that, I sure wish the State would allow DNA testing for people who claim that they're innocent. They don't do it willingly and they do it under limited criteria. And as you know from the Alaska case, the State can absolutely refuse. And generally California doesn't. And, you know, I think it oftentimes has value and it is oftentimes ordered by the court. And in cases where it looks like DNA is going to have probative value, that's entirely appropriate. But, you know, the fact is that if a DNA sample is uploaded and there's a hit to a rape that is being investigated by police and all of a sudden it's a different suspect than what they had, then that's going to cause them to do further investigation, certainly, and may well lead them to investigate the true perpetrator of the rape rather than the person who they are currently investigating. I want to ask you about Friedman. I'm really troubled by Friedman. Judge Thomas wrote a really good opinion there. It's very broadly written. And it seems to have, he seems to clearly say that all of our earlier jurisprudence, Kincaid and so on, and then this Samson case with the Supreme Court and so on, deals with people who are either convicted or are on parole or there's a continuing need for the State to supervise and monitor them. Whereas in Friedman's case, he was arrested. Now, I've read to your opposing counsel what might be a distinction or may not be a distinction at all. But would you agree that if Friedman applies to this case, the State loses? I think it depends on what you mean by Friedman applies. If the facts of Friedman are on all fours with the facts of this case, are we not as a three-judge panel bound by what Judge Thomas wrote? An en banc panel could change it. Sure. But are we not bound by what he wrote in the Friedman case if the facts are on all fours? I mean, if the Friedman case is read to conclude that in all cases, an arrestee has a sufficiently high interest in the privacy of his identity, then, yes, Friedman may be binding. But I don't read it that way. Basically, Judge Thomas says this is clearly a search. There's no warrant involved here. There's no suspicion involved. It's just done for everybody. And the Constitution says you can't do that because I guess it gets down to unreasonable. He says it is unreasonable, and he decides some cases to that effect. But just on a textbook example, he seems to cover what we've got here unless we distinguish it. How would the State distinguish Friedman from this case? Well, I think by pointing to the language of Friedman itself. I mean, in the beginning of the opinion, Judge Thomas says, quote, Because the forcible taking of the DNA sample under these circumstances violates Friedman's clearly established Fourth Amendment rights, we reverse. So, first of all, it's a forcible collection, which is not the case. But this statute permits that, does it not? But only where the individual refuses to give the sample. And that's what he did here. He refused to do it, so they took it from him by force. So, in other words, if that's your distinction, you're going to have to have California renounce the use of force as a way of getting it. Well, I think that's one distinction. The other main distinction is there there was no statutory provision that justified the collection of DNA. They were attempting to use a Montana statute that could not apply extraterritorially. There was no Nevada statute. There was no Nevada database. And so you didn't have a statutory justification. But as Judge Thomas indicated, and I don't think anybody could disagree, the Bill of Rights trumps any statute. If the statute trespasses on our rights as American citizens guaranteed by the Bill of Rights, it doesn't work. So the real issue here, just like it was in Thomas's, is opposing counsel correct that just blanket taking the buccal swab from all arrestees for whom there was no warrant to take that, there's no suspicion of any need to take that? For example, he pointed out, or you pointed out, if you've got a rape case, then you may have some actual basis to take the buccal swab, because sperm or whatever may be the basis for identifying the person who committed the crime. But in this case, you've got a protester, or you've got someone who, I forget what the other people did, but basically these were not major, major, major things. And I don't think there was any sex offenders involved there. Why wasn't Judge Thomas's reasoning applicable to this case? Because I think certainly that a statute that violates the Fourth Amendment gives way to the Fourth Amendment. We're not arguing otherwise. Right. But you do consider what the statute provides in weighing the totality of the circumstances. I mean, the core, I think, or one of the core concerns about the Court in Freedman was that it implated the core purposes of the warrant clause. I mean, the Court cited Schmerber to say that the purpose of the warrant clause was to ensure, quote, informed, detached, and deliberate determinations of the issue of whether or not to invade another body's search of evidence appeal, end quote. And there you had, and Schmerber goes on to say that law enforcement officials who are engaged in the chase and, you know, after the suspect and, you know, they can't make that determination. They can't have that deliberative process. In California, however, I think the statute is relevant that the voters have made that determination. You know, and you call it in your brief a programmatic warrant. But if you change the word to general warrant, we all know that a general warrant is no good. So we don't have anything that resembles a warrant in my view. We have a statutory determination or a legal determination by the voters of California, which may, I think, be relevant to the weighing process in terms of how strongly the voters of California might think the interest is. But I strenuously resist analogizing this to a warrant because that sounds like general warrant to me, and we know those are no good. Well, I would say that it certainly implicates the balancing vitality of the circumstances. I mean, there's a lot of use and confidentiality restrictions. And it also explains why this case is different from Friedman because there you have the core purpose of the warrant clause being implicated by law enforcement targeting this one person for evidence of guilt versus, you know, general statutory protections that don't implicate that. I'm inclined to read Friedman as saying the status of being an RSD without more is not enough to justify taking of DNA. Now, the more in this case is the California law. Anything else? It's also the fact that California has this comprehensive database that, you know, there was no database in Nevada for these officials to compare the sample to. And so all of the compelling interests that are identified in Kincaid and Creasle behind maintaining this database so that it can assist in solving past crimes, so that it can inform police officers about whether or not this person should be held on bail. And, you know, certainly implicates the case itself. I mean, a prosecutor may prosecute a case very differently if he or she knows that this individual may be implicated in past rapes or murders. And so I think it is very different where you have a statute and a database weighing strongly in favor of the government, as opposed to what I think are minimal interests. What's the justification for – I mean, let me divide up the RSDs into two categories. One of them, you're just an RSD. And the other one is you're an RSD who has been convicted. Or maybe I should do categories. You start out with just RSDs, and then they're divided into two groups. Two-thirds of them will be convicted, roughly speaking, and one-third of them will not be convicted. Either they're never charged, you know, various ways in which they won't be convicted. What's the justification that California has for keeping the DNA identification of those RSDs who have been let out of the system and either have been held innocent after a trial, held not guilty after a trial? The prosecutor looks at the case and never even brings any charges. What's the justification for keeping the DNA for those – for basically that one-third after we know the result of the criminal process, that is to say after we know they're never going to get convicted on this? Several things. First of all, you know, it's worth pointing out that there is an expungement provision. So all these – But I want to point out, it seems to me quite right, it is very cumbersome, very expensive, uncertain. I just want to – I just want to point out that, you know, we've – in the declarations, we've cited that you don't have to go through the court process to get the sample expunged. You can provide a letter to the Department of Justice that has the information required by the penal code, and the DOJ will expunge that sample without going through a court process. You can still go through that court process if you're not happy with the result. You don't have to go through the court process. How do we know how often sending the letter will work, then? Do we have much evidence on the record? We don't. We don't, Your Honor. But it – so I don't think it's quite as cumbersome. Moreover, the – California is a big state, and the state does not currently have the technological capability of automatically expunging a profile. You know, that strikes me as nonsense. Put them into two piles. Arrest these, and then you put it into the permanent database as soon as they're convicted. And you don't if they aren't. And what I'm saying, Your Honor, that there is no message that comes from the district attorney to the Department of – I mean, the samples are, first of all, not in there by name. They're in there by number. Right. And there's just no automatic system of doing it. It does not – but it does not strike me as difficult to set up such a system. I think it may be more difficult than you might imagine, given the size of California. But I think the issue is we keep fingerprints. We keep arrest records long after an individual has been acquitted. And the – there is no process, in some cases, for expunging fingerprints. And the process for expunging arrest records is much more onerous than the process here. So long as the individual – the collection of the DNA at the time of arrest was valid, I don't think there's a Fourth Amendment right to have that subsequently expunged. Yeah, but you didn't quite answer the question. We've said various things that are relevant to the answer. But what interest does California have in retaining the DNA identification after the person's out of the system, not having been convicted? I mean, I think in – obviously, the solution to future crimes, if that individual is not convicted for the crime for which they were arrested and they commit a future crime, then the sample will be in the system. I think there's a turn effect. An individual who knows that their sample is in the system will be less likely to commit crimes in the future. And what do we know – I can understand in the abstract that that would be so. What do we know in terms of real-world experience as to how valuable the DNA evidence is for those who get out of the system without ever having been convicted? I don't think there's evidence in the record, Your Honor. I don't think – the statute just hasn't been in effect long enough, I think, to have that kind of systematic data about the rate of hits on individuals whose DNA was collected at the time of arrest but were not convicted, which is, I think, what you're asking for. That is exactly what I'm asking. And we don't have that data. I'd like to follow up on Judge Fisher's question on a slightly different bent. Judge Breyer, of course, because he decided in favor of the State, never really got very far in considering the requested preliminary injunction. He sort of went through the winter factors. But that – it wasn't a big deal. Hypothetical, arguendo. If we agreed with Mr. Rischer's position, wouldn't we have to send this case back to Judge Breyer for purposes of ferreting out what needs to be done? I mean, there are all kinds of takings of these samples that's been done over time. I don't know whether they're really segregated. I don't know where they've gone. None of that information is in the record to the best of my knowledge. So, again, I'm not saying this is what's going on or anything like that. But hypothetically, if we agreed with him, wouldn't we have to send this back to Judge Breyer to fashion an appropriate remedy? Oh, absolutely. And when we say that in a brief, that if this Court disagrees with Judge Breyer's legal analysis, it should be sent back to him. I mean, there's a whole host of difficult issues the State has identified that were discussed more in the Court below than before this Court, given the procedural posture. Judge Breyer was incorrect, was he not, when he talked about the totality of the circumstances. At least that's not argued in Friedman, is it? It's argued in Kincade and the other conviction parole cases. But did Judge Thomas talk at all about totality of the circumstances? No, Your Honor. I think that's why Judge Breyer concluded that Friedman didn't apply, because Friedman did not apply the totality of the circumstances. Does he have to? It seems like, at least in my wrestlings with this, it seems like you're getting to this line on the continuum. At what point do the needs of the State trump the privacy interests of the individual when somebody is in a system where they're convicted or they're controlled by the State versus an RSD who has never been charged, I mean, never been convicted? We're getting into a gray area, I'm sure you would agree. And it seems like Judge Thomas said, you know, if you have a warrantless, suspicionless taking of somebody who's been arrested, you've reached the point where there's no totality of the circumstances argument. It's just flat out a violation of the Fourth Amendment, and you can't do it. Isn't that what Friedman says? I think in the context of that case where there's no statutory authorization and none of the compelling interests on the other side, but I think where you have a database in place, where you have these use and confidentiality restrictions, I think it is different. I think the line is this RSD is in police custody, and there's a lot that we can do to an RSD in police custody. We take their fingerprints. We look for identifying marks. We take their mug shot. That's the fact that all of these people who are the subjects of this lawsuit, that I guess Mr. Risher even conceded there was probable cause to arrest each of these people for a felony. Absolutely. He didn't say they were guilty. Matter of fact, he said it was the contrary. But there was probable cause to arrest them. Does the fact that they – there was probable cause, they're arrested, they go through the booking process, their expectation, their reasonable expectation of privacy rights are greatly diminished during the time of their confinement. Absolutely. Is that sufficient to bring it within the ambit of Kincaid and the other progenies from our court and Sampson and others? Absolutely. I think it is. Because there is – because an individual who is in custody has very little privacy interest. I mean, you know, they're being watched by jailers 24 hours a day. Their meals are being controlled. Again, they're subject to strip searches, which are much more invasive than the DNA swab. And I want to, you know, reiterate, I think Your Honor is right about the level of bodily intrusion. You know, I think it's very different for someone to take your finger and roll it on a piece of paper versus the – in most instances, a buccal swab is taken by the prisoner himself. I mean, subject to law enforcement watching them. But they're the ones who do it themselves. It's just a popsicle stick. Now, the strip searches, I think that's one of our very recent cases here in this city. And as I recall, the governmental reason that allowed that was safety and security because they were concerned that somebody might bring in, you know, something deadly or drugs or whatever. No, sir. Does that apply here? No, I think the rationale for Bell and Bull were both prison security. And that's not present here. My point, though, is that the fact that an officer is determined that there's probable cause that an individual has committed a felony, that entails a whole host of invasions of the individual's privacy. So it goes down to – on the continuum of the level of expectation of privacy. Exactly. Your Honor, let me come back to the totality of circumstances ideas, whether the Sampson – they basically say totality of the circumstances. And then the question as to whether or not Judge Thomas and Friedman did that. He has a separate section discussing whether it's reasonable. And he says, Defendant's final argument is that the search was reasonable, contending that pretrial detainees have limited privacy rights that must yield to the desires of law enforcement to collect DNA samples for law enforcement databases and so on. Although he doesn't call it totality of the circumstances, the discussion under that heading as to whether it's reasonable seems to me that he's considering those factors. Well, I think if you look at – Do you disagree? I do. Because if you look at the governmental interests that he's analyzing, he's only analyzing the governmental interests in prison security. And so I think he's still focused on, you know, sort of the strip search line of cases, this prison security line of cases, and isn't really engaged in the full totality of the circumstances analysis that's required by Kincaid and Caruso. I mean, it's a very truncated analysis, because I think he is still focused on prison security rather than a full totality of the circumstances that would consider the arrestees' full privacy rights versus the state's interests, which, again, are very different in that case. Well, it may be that you disagree with his analysis, but I'm not sure that he wasn't analyzing it if he thought it was the totality of relevant circumstances. I would say even if he – I don't think he was. Even if he was, again, the balance is very different here, where there was no database to run that DNA through. There was not going to be assisting the prosecution in Nevada with – You know, let me read you the last sentence in the paragraphs discussing reasonableness. Judge Thomas writes, their purpose was simply to gather human tissue for a law enforcement data bank. I think that was Montana's. I mean, I know there's another footnote in Friedman that says – Well, no, let me read you the previous sentence in the same paragraph. The Nevada authorities extracted the DNA from Friedman not because they suspected he had committed a crime, nor to aid his reintegration, nor as a matter of continuing interpretation. Their purpose, that is to say the purpose of the Nevada authorities, was simply to gather human tissue for a law enforcement data bank. I mean, I think that might have been wrong. There may have been no data bank, but that's what he thought he was. That's what he thought the facts of the case were. Well, my understanding is that they were collecting the DNA to Montana for Montana's database because they had, I think as Judge Smith pointed out, forgotten to collect the DNA. And there's another footnote in that opinion that says there is no Nevada statute that warrants the collection of DNA. I got that part. So I think it was a different database in a different state that did not apply extraterritorially, as Friedman itself held. And so in California, California runs DNA samples through its database, also the national one. I got that. And I think you're describing this correctly, that it's not as though in Friedman this was sought to be collected solely because it's a one-off deal. No, they're going to put it into a data bank. It's just as Montana's. But I got the point that it's not the same state. Right. If Friedman is on all fours, the only way we can help the state, I believe, is to find that we are bound by Friedman and ask the court to take the case on bonk. Do you agree with that? I mean, if the court concludes that Friedman's team holds the outcome. It's all hypothetical. Then yes. If we concluded this, and if we concluded we are bound by a previous three-judge panel's decision, that means our hands are tied, right? Right. Under Miller. So in that case, all we could say is, you know, we think the state's got all these things going for it here. We don't agree with the analysis. Or we think it overstates it. It needs to be done on an as-applied basis. And we think the court needs to take this case on bonk. Isn't that what we would be required to do in that? In that you found that Friedman controlled the outcome of this case, yes. Okay. If there are no other questions. Thank you. By the way, I would have to say, even though we're not done, I really appreciate the excellent quality of the argument by both counsel. I compliment you. It is a pleasure to be able to have a reasoned dialogue with counsel. It doesn't always happen. Thank you, Your Honor. If I can take some of these points maybe in reverse order. First of all, as to what was going on in Friedman. Friedman involves exactly the facts that are authorized here. If you look at the first paragraph, it talks about putting the district attorney wanted to put Friedman's DNA sample in a cold case databank. First paragraph of the opinion. If you go on to the end of page 851, indeed, Luziach, who was one of the people who were sued, deputy district attorney, had ordered the search to use Friedman's DNA in the investigation of cold cases. That's a Nevada official. She's ordering it. There is no separate. I mean, there is a separate Nevada and Montana databank. But once you put it into it, it's all run against CODIS. It's a national databank. This is being done by Nevada officials, run through the Nevada part of CODIS as a practical matter. It doesn't make any difference. It's all the same databank ultimately. Chandler v. Miller is an interesting case for this because in Chandler, the Supreme Court addressed the situation where the State was saying, look, we have a new statute. Won't you make a new exception to the Fourth Amendment warrant requirement to accommodate it? And the Court in Chandler said, no. We will only do so when the State can point to a concrete danger that demands that we depart from the Fourth Amendment's usual rules. We don't have a concrete danger here. So whether you look at the burden as factual or forensic, the State's burden is to show that arrestee testing is so much better than testing after conviction, we should create a new exception to the warrant requirement. And they run into a lot of problems for even among them. But, I mean, the practical problems, well, we can't take samples out of our arrestee databank upon conviction. I don't know whether that's true. It seems strange for a complicated databank. But there's a very easy solution. You wait until after conviction to take the sample, and then you don't have to worry about any expungement. You've gone through the criminal justice system. And when we're talking about this continuum, and of course there is a continuum, arrestees are like the rest of us in that they haven't been convicted, but they can be in custody. Well, if identification is the touchpoint, what about a Terry stop? In a Terry stop, the police can stop us, and they can make us identify themselves under HBIL. Now, identify ourselves doesn't mean they can say, hey, are you guilty? Are you the same guy who committed that robbery last week? So, again, we run into these problems with identifying. Identification in the administrative sense doesn't mean identification, did you cheat on your exam in seventh grade? But doesn't that get us back to the facial versus ad applied situation? It seems to me in an ideal world that may not be what we're dealing with here. In an ideal world, you would be able to on an ad as applied basis say, you know, in this particular case, they didn't just use this, you know, for identification. They wanted to find out whether this guy has a familial tendency to diabetes because that will help us diagnose things. That would be a whole different search, a whole different misuse, and perhaps a serious constitutional challenge. Why should we basically find the statute on its face to be unconstitutional when, in fact, your better challenges are on an as applied basis? Well, a few reasons. First of all, this is an as applied challenge, but it's not one based on specific facts of that type of misuse of the database. The federal public defender in her make us brief cited Thomas Jefferson, quoted him, the time to stop the government is before they've got hold of us, which I think is particularly compelling in this case. Just like Judge Reinhardt's dissent and Judge Kaczynski's dissent as well. Yes. These are fellows who are used to speaking their mind. They are. Thomas Jefferson included. Indeed. We won't know what the government's doing with this. It's very, very difficult to get information from the government about its database. They have all the facts. That's why we have a Fourth Amendment. That's why we have our income tax either. Pardon me? You think we ought not to pay our income tax either because they'll have all that information? No, it's because they'll have all that money. And can give judicial pay raises. Indeed. So I'm more than happy to get my income tax. I think we're to the point where you better wrap up before this deteriorates. Okay. Do you want to last one minute? Yes. Okay. I won't send them a DNA sample with my database. Two points. Exoneration requires DNA samples. It does not require database. If there's a rape, there's semen recovered, it doesn't match the person you've arrested, that should be enough to exonerate the person. The police don't need specific statutory authority to conduct searches. They do that all the time. And this law, the statute authorizing it, doesn't somehow eliminate the discretion to take a sample. It simply transfers that discretion from the DA in Freedman to the officer on the beat, who I think Mr. Powell just said is the last person we want to give that discretion to. If the police want to take our DNA, they can do it the way they have done it since DNA technology started being used. They can get a warrant. It's not a high standard. They can do that. Or they can follow me around and pick up my pizza. They can follow you around and pick up your pizza. Or they can get a conviction. And there's no challenge to that. It's been upheld by every court of appeals. What they can't do. Could they handle each inmate an envelope and say, would you please lick this? Is that less intrusive than a buckle swab? Sure. It is less intrusive. If they were to do that, then we would encounter exactly the same question that we were looking at, a similar question to what the Supreme Court looked at in Ferguson, where the Supreme Court, because there was no coercion to force the women involved in Ferguson to get urine samples, to give urine samples, they weren't being ordered to do it on pain of prosecution. The Supreme Court in that case said, well, okay, it's a slightly different analysis. We'll see whether this deception and taking a sample that the women think is being used for one purpose is in fact being used for law enforcement purposes. Okay. Then we'll undergo the special needs analysis. So if the police were to do that in a custodial setting in particularly, then Ferguson would be the main case. Because they're ordering to do it, the main cases are 40 years of Supreme Court cases and cases in this Court, 40 years of precedent from Schmerber to Friedman to Gantz say that this is unconstitutional. And I'm asking this Court to, the district court erred in holding otherwise, this Court should reverse, remand with instructions to issue a properly tailored injunction. Thank you. Okay. Thank you very much. The case of Haskell v. Brown is submitted. And I will repeat what Judge Smith said. Thank goodness for good lawyers. This was a beautifully done case.
judges: Todd, Fletcher W. , Smith M.